Thank you, Your Honor. May it please the Court. It's my honor to be here representing the appellants, the sailors who are involved in this case. What we are asking this Court to do is to reverse the order dismissing the case against both defendants and to order both defendants to answer the third complaint, third amended complaint. What we are going to do today, and I think you probably understand this already, is I'm planning to argue for a total of 15 minutes, hopefully 10 minutes, and save 5 minutes for rebuttal. Mr. Cabral Bonner, who is by video, will argue the same way, 10 minutes, 5 minutes for rebuttal, in that order, in both cases. I'm going to be focused on the General Electric case, although there will be some overlap. I will talk primarily about General Electric, but there will be some overlap with TEPCO. Mr. Cabral Bonner will talk primarily about TEPCO. I'm going to jump right into it, with your permission, since I have limited time. What I want to do is to talk about the three-part test. This is critical not only to General Electric and the channeling provision, but also critical to the Comittee question. Three-part test, no dispute about that. The first two parts, I think, are easy to answer. There is a conflict in the law between Japan and here in the United States and in California. I think the conflict is real. I don't think there's any doubt about that. So then we get to the question of, among those two jurisdictions, which one impairs the interests of the other the most, which I think is the test. So it's unfortunate that I can't do this by chart, but the way I envision this and what I'm looking at right now is essentially a page with a line down the middle, and on one side is the impairment on Japan. Excuse me, just so I can follow your argument. You're speaking of choice of law now, but earlier you said you're focusing on GE. But is this particular argument, is it directed to choice of law to both GE and TEPCO or just GE? Yes, Your Honor. Yes, I'm going to focus on General Electric, but we'll talk about both, particularly as to the standard. But I'm going to be focused on the facts of General Electric. All right. But your argument now on choice of law, your direction is General Electric to GE. Yes, sir. Thank you. Yes, sir. So on one side of the equation, Japan, and I'm trying the best way I can to be as an advocate to be fair to them. I've got three areas that it impairs Japan. First, the nuclear meltdown definitely happened in Japan. There's no doubt about that, number one, and they care about that because of that. Second, the Japanese lawmakers are going to want to have control over the regulatory and legal scheme that will control a nuclear accident in their own country, of course. It makes sense. It would be true of any country, by the way, but it's true of Japan. So there's an impairment. Third, they want – this is a more controversial argument, but I think it's certainly a reason to attract foreign contractors to come to their country to help with the creation of these nuclear reactors. And they are arguing that that is impacted if Japan is not in control. So that's on one side of the equation. So now we've talked about Japan. Let's talk about California and the United States, which I think both are critical, by the We have American sailors. We have not all, but California sailors. We have plaintiffs – and by the way, can I just say this, if I can? We have two cases. Your Honor already raised this question. You cannot put these in the same box. They're different. And they both have to be analyzed separately. And I'm talking now about General Electric. So we have American sailors. We have American citizens who were on U.S. ships who were sent to Japan by the United States government. All those things are on the American-California equation. The injuries occurred when they were exposed to radiation on American ships. And I can talk about this more as we go through it, especially if you have questions. But the So to follow that so far, American citizens, American sailors on American soil, and this dispute, this dispute against General Electric is against an American company. And what's in had a defective product. They designed a defective product. They produced a defective product and manufactured a defective product. So on our side of the equation, you have Americans with a case, American sailors, against an American corporation about a product that was designed and created in the United States, in California. So what substantive law would you apply to that claim? California. Why California? California because it's where the product was designed, it's where it was created, it's where it was manufactured. Does GE still have its nuclear headquarters in California? I don't honestly know the answer to that question. I don't know. They may have moved. I feel like I've heard that at some point in this eight years of litigation. But I know they were at the time the incidents involved in this case occurred. Do you have a California case that you think is close to this one? In which something was designed in California for use somewhere else, someone was injured somewhere else, and California said, we will apply our own law to the design and manufacture of that product. Of a product that was actually created in California? Yeah. Or designed in California. And or designed. I think there are a whole, I don't have them in my head, but I think there are a whole... Because we have a number of cases that have been placed in the briefs that dealt with application where California courts said, we're going to apply the law of Louisiana, we're going to apply the law of Oklahoma to these things, because that's where the injury occurred. That's where the product was actually put in place. And so when we have California courts telling us we're going to apply the law of somebody else to the suit in California. So I'm wondering, okay, what's the case that's close? Yeah. Well, Judge Chamartino did that in this case. And she talked about the two cases, two cases that you just talked about. Sure. That's what I want to know. What did Judge Chamartino miss? What case should Judge Chamartino have looked at that would have told her that if these were California courts, not California federal courts, but if this had been California courts, that by golly, they would have applied California laws to this. Fair question. So I think the issue is, first, you have to step, from my perspective, step back the two cases that she talks about. Let's use those as an example. Those are both cases that are... That's McCann and Offshore. Those are two important cases in California. So can you give me, if Judge Chamartino is looking at what California courts have done, she's going to look at Offshore and McCann. What other case should she have looked at? I can't, as I'm standing here, name the cases. But if those are the two biggest cases in California, what makes you think that Judge Chamartino did this wrong? They're not. It's completely different. I think everybody in this courtroom would agree, this is an incredibly unique situation. In those two cases, you had parties who voluntarily went to California and took on the risk and, in this case, the application of the law in that jurisdiction. That didn't happen here. Nothing like that happened here. Those two cases... I'm sorry. I didn't understand. Stay with me on this, please. You don't have to agree with me, but I do want you to understand what I'm trying to say. What I'm saying is, in those two cases, you have... I think one of them was a corporation. They may have both been corporations. They went to California and did business. They did business in a different jurisdiction. In other words, by doing that, they voluntarily... This is what she said. It makes some sense. They took on the risk associated with whatever law would apply to them in that forum, right? That's not what happened here. What happened here was we have hundreds of sailors who were sent at the request of Japan by the American government, the President of the United States, to a different jurisdiction because they served the United States of America. They didn't choose to go there. They choose to serve their country. Those cases are not remotely the same. They're completely different. And so I think the answer to your question is the same analysis that applied in all these cases, and there are a whole bunch of them, I think the same analysis should apply. So let's step away from it just a second, if we can. And I do want you... You don't have to agree with me, but I hope you understand what it is that we're saying. Because I think this issue is very different than DEPCO. What we have is American citizens suing an American company that produced a product that's involved in this case in California, in a California court, in a diversity case. And what the argument they're making is this ought to be controlled by Japanese law, and it ought to happen, well I guess in this case, completely dismissed. So the net result of all this is no little liability, complete immunity for a company that did business and chose to do business in the United States of America, to produce a product in the United States, and we have complete immunity. Because, and I have to make this point, because there was a meltdown and a tsunami in Japan. By the way, that's not where the injury occurred. The injury didn't happen in Japan. The injury happened on an American ship based on the allegations of the complaint, which is all we have, because there's been no discovery whatsoever. On the allegations of the complaint happened in international waters, which according to the treaty, the Convention on High Seas, means it's under the American flag and it's on American soil. So, where did the tort occur? Right, let's go there. Where did the tort happen? The bad behavior all happened in the United States. It didn't happen in Japan. That's where the tsunami happened, but that's not where the bad behavior was. That's not where it was designed, that's not where it was manufactured, that's not where it was shipped from. That's number one. Number two, where did the injury happen? The injury happened on American soil, on an American ship that they didn't choose to be on. They were serving their country. So, is that how you distinguish offshore and McMahon? Because in both of those cases, the plaintiffs voluntarily had injected themselves onto the foreign soil or the soil where the judge or the court found it. The two cases that we just talked about. So, you would draw a distinction between almost like voluntarily taking – one was on a sales trip and one was working in the foreign jurisdiction. That's correct. That's exactly – yes, ma'am. That was the point I was trying to make. Okay. But can I just put it in a bigger picture? I mean, just think about it. What you're saying is if you weren't in this – GE wasn't joined with TEPCO in this litigation, your case in the ordinary course would proceed under California law in California. All day long. And it would be a ridiculous argument. Oh, which case should be in Japan? They should be controlled – by the way, the court here can apply Japanese law just as well as they can in Japan. But what they're saying is – I mean, really, are there any accountability? This entire argument is GE walks away no matter what they did, however bad it was. It doesn't matter. They walk away. No accountability whatsoever. This makes absolutely no sense. It just doesn't. I guess academically you can make the argument. We have smart lawyers on the other side. You know, they know how to argue this, and I'm sure they're about to do it. But this does not make any sense. You're using up all your time, but a quick question. Did you have an oral argument before the district court in this case, or did she rule on the papers? I believe there was oral – you know, I don't – I was there, but I can't tell you about the specific – I don't think this specific thing was argued. I'm getting very nervous about time right now. But can I end with this? I don't want to leave out that I think the CSC is critical to this question, too. And I know Your Honor wrote an opinion on this, and you very much focused on this in Majika and this case. And I think it's critical that this is not in the interest of the United States of America for all the reasons Your Honor has already written. I won't talk about them because I'm literally about to run out of time. May I stop now? Yes. Thank you. All right. And Mr. Bonner will say next. You may proceed. Okay. May – police court, are you going to reset the clock? The clock I see says 22 seconds. There we go. Okay. May I please the court? My name is Cabral Bonner. I'm going to be speaking and focusing particularly on the TEPCO issues. And the question is, did the district court abuse its discretion by failing to give serious weight and due deference to the interests of the United States government as articulated in the United States government's amicus brief? Now, as an abusive discretion standard, we have to show that since the court did apply the correct law, that the application of that law was illogical, implausible, or without support or interest that may be drawn from the facts. Now, the district court, in this opinion, following the motion to dismiss the third amendment complaint, did not go into a full analysis of the Mujica factors. Instead, Judge Sammartino focused in on what she called, quote, significant changes since the significant changes. The first significant change was the choice of law analysis that she applied to TEPCO, which I'll get into in a minute. The second significant change was the Japanese government's objection to the suit. And the third significant change were two issues, one related to Bartel, the other related to negligence and strict liability, that she ultimately determined did not tip the balance in favor of dismissal. So, with respect to the factors she used to support dismissing this case, it was simply choice of law analysis and the Japanese government's objection. So, what defies logic is why one of the significant changes since the Ninth Circuit, why in that list, Judge Sammartino did not include the amicus brief by the United States. Yet, while she mentioned the brief was filed, she spent no time discussing the brief or the implications of the brief, and most importantly, doesn't discuss the serious public and foreign policy interests of the United States that were developed both in that brief and in the Ninth Circuit's opinion. In the Ninth Circuit's opinion, what you all said is that if a country knew it could receive the benefit of exclusive jurisdiction, the exclusive jurisdiction provision by becoming a part of the CSC after a nuclear incident has occurred within its borders, as Japan did here, or even avoid foreign jurisdiction altogether by virtue of international harmony, there would be less incentive to join the CSC. This, which was raised in the Ninth Circuit's opinion and the interest raised in the amicus brief, where the State Department said, holding that international harmony requires dismissal of suits brought in the United States by U.S. citizens for entries from nuclear incidents abroad would effectively provide for exclusive jurisdiction without the other components of the treaty. The United States policy does not call for advancing one element of this system in isolation of the other, but this is exactly what the District Court has done. And not only has the District Court done this, but the District Court has done it without any analysis of the implication. As Your Honor pointed out, in the- Well, in fact, counsel, the two briefs were before us on the appeal. Yes. They're not really a significant change. We analyzed them on our opinion. They're not really a significant change from the facts. We are- Well, I understand that. And that's exactly my point, Your Honor, that the District Court identifies and calls in her opinion, she says, significant change since the Ninth Circuit opinion is the Japanese brief in opposition to this suit. It's not a change of the Ninth Circuit opinion because we had the benefit of the Japanese brief. What it is, is it's a change from her original analysis that was on appeal to us. Okay. So then why, logically, did she not also include the American brief? I've got the U.S. brief in front of me. And what page do you think that the U.S. said, this will impair U.S. interests? I don't see anything in here. I think the U.S. was very, very careful in this. They said, for example, on page three, that our interest does not require dismissal at this time. Elsewhere, they said that they did not believe that the court should give due regard to Japan's brief, but the United States does not believe that the District Court abused its discretion. So, I mean, throughout this brief, the United States was very, very careful to say, we are not asking you to overturn the court based on our interest, but you can decide that it was not an abuse of discretion. And Judge San Martino then comes through, and we left open in our opinion that there might be additional circumstances that ought to be factored into this, and that the question of comedy is loose enough that it could change over time, it could shift over time. And it seems to me Judge San Martino acknowledged all of that. Well, she acknowledged all of that in that she did focus on that footnote saying that the circumstances might change. And in her analysis, what I'm addressing is that in her analysis of what changed, there was no weight given to the position of the United States government. She doesn't analyze, for example, what Your Honor pointed out was that with respect to the United States' interest, it does have a significant foreign and public policy interest in the exclusive jurisdiction provision is a bargain for exchange that the countries enter into, and Your Honor stated that this case and the Japanese government becomes the poster child for recalcitrant countries who choose not to join the CSE. That doesn't tell you anything about choice of law, and choice of law could be an additional factor in the comedy question. That is true. So let's look at the choice of law analysis. What she looks at with respect to choice of law are essentially three distinctions that she points out. One is that under Japanese law, essentially strict liability would be the only cause of action. The second is that the burden of proof would be high probability of causation as opposed to preponderance. Third is that there would be no punitive damages. Now the question is, if the judge agrees that Japanese law should apply, could the judge apply those changes? Could the judge have dismissed all causes of action except for strict liability, dismiss the punitive damages allegation? Now there's two of those three issues gone, and simply give an instruction to the jury that instead of being preponderance, the instruction is that you have to find by a high probability of causation. If the judge is able to do those things within California courts, then the balancing test then in light of the Japanese concern, which is that adjudication in California courts will be different than adjudication in Japan. If that's the concern, that difference in the standards, difference in the cause of actions available, difference in punitive damages will impair Japanese courts. The California courts can simply apply those laws. And so the balancing test then becomes, if in Judge San Martino's court she can address these issues, how then does the matter balance with respect to what I believe were serious public and foreign policy issues raised in the State Department's brief and in the Ninth Circuit opinion regarding the incentive that's created to join the CSE if countries know that they could get the exclusive jurisdiction through another means, by their own legislation that will then be given deference in an American court, and the case will then be kicked out in an international committee. It's not by virtue of the CSE that Japan gets exclusive jurisdiction. It's by application of California's own law. That's just a discussion we were having with co-counsel. No, and what I'm suggesting, Your Honor, is that there's two issues. One is whether Japanese law applies. The second is whether in TEPCO's case, not NGE, in TEPCO's case, whether the application of Japanese law is dispositive on the issue of comity. The court in Mojica says that the choice of law analysis is just one element. Is there anything to suggest that the Japanese are not capable of administering their own compensation program? They've administered, what, something like $58 billion to their own citizens and to others? The figure keeps changing, but it's... The figure keeps changing, yes, Your Honor. It keeps going up. What I would ask, Your Honor, and what has not been... I know you want to ask me questions, but I'd like you to answer my question first. I'm not asking you questions. Is there anything to suggest that the Japanese are not capable of administering their own compensation program? Yes, with respect to personal injury claims. There has been zero provided to us about the amount of this money that is actually for personal injury claims. And the fact that the flip side of that is, would there be any reason our clients cannot move forward with their cases in Japan? We have a lot of sick servicemen and women who live here in the United States. The doctors who have treated them are here in the United States. The witnesses who were injured while they were on board, the naval and vessels, where the witnesses to those injuries are people here in the United States. So the flip side isn't whether... The question that we would pose is that our plaintiffs cannot adjudicate these cases. Obviously, Japan has adjudicated lots of these cases. My understanding is that the vast majority of them have to do with business losses and not personal injury. Counsel, do we have any idea whether they've dealt with any personal injuries? I do not know. I would assume they have to, but I do not know. Yeah. I mean, it seems like quite an omission on your part that you wouldn't know whether because it would be interesting if it was all business losses. That certainly might be influential here, but how do we figure that out? Do we have anybody injured in Japan that we know of? We do not have... We have not gotten to the point of discovery, so there is no competent evidence that we'd be able to produce. Well, a lot of stuff that's in your complaint comes out of reports in the New York Times about the construction of nuclear reactors and so forth. Is there nothing in the New York Times about people on the ground injured in Japan? Well, I'm sure there is, but we do not know whether or not those people have gone to the system. The information that we've relied on is information provided by TEPCO's lawyers, and if we could get discovery on this, we would like to know that fact, but what we have been presented with thus far are large generic numbers regarding these compensations, which we understand through the context we do have in Japan are mostly related to business interests, not personal injury. So the abuse of discretion in this case was failing to give the same deference to... And while the amicus brief was not a full-throated position that the case needs to stay in the United States, the issues raised ought to have been discussed by the district court, and we think that there is, based on this court's prior ruling and order in TEPCO 1, that there was enough of a position, strength of the position of the United States government that the case should be remanded with an instruction to order the defense to answer the third amenity complaint, and I'll reserve the rest of my time for rebuttal. Thank you, counsel. Good afternoon, Your Honors. May it please the court, Mark Yohalam for TEPCO. I want to start by talking about the Comity decision, and I want to correct what I think is a mistake from what my friend on the other side has said about the district court's analysis. The district court explicitly analyzes the interest of the United States, and you can find that on ER 27 to 29. I think the source of Mr. Bonner's confusion here is the headings in the district court's judgment. Those headings are because the district court's analysis was responding to TEPCO's arguments, but it is not that the district court exclusively viewed the Japanese government brief as important and ignored the U.S. government brief. To the contrary, there's an entire paragraph in which the district court walks through it. It quotes this court's determination of what the United States' interest was, and in fact, that is exactly the interest that Mr. Bonner said it didn't analyze, where it says, the United States believes that maintaining jurisdiction over this case will help promote the Convention on Supplementary Compensation. Who are you reading from, counsel? Page 27. It's 24 of the district court's order, and I think it is 27 or 28 of the excerpts of record. It's a paragraph that starts during the appeal. I've got ER 69. I think it's in two places because it's part of their notice of appeal. And the court then, after walking through what those interests are, acknowledges that both the interests of the United States and Japan are important competing policy interests here, and it weighs those interests. It explicitly says it's weighing those interests. It's true that it's not a voluminous tome of analysis, but the idea that the district court failed to recognize those interests or give them weight is directly contradicted by the record. But taking a step back for a moment, where I think I'd want to start is that even if nothing had changed, what this court held in Cooper 1 was that applying the abuse of discretion standard, this was a closed case with competing policy interests. I can't speak for my colleagues. I will speak for myself when I signed on to that sentence about the validity of the choice of law. And what I was contemplating with things changing would be not the court would conduct a legal analysis. It would be facts on the ground, some new fact that showed the urgency of the Japanese interest. And she doesn't cite, Judge San Marino doesn't cite any real changes in facts or changes in law. She just did a choice of law analysis. The briefs had already been filed, although she had not considered them. But there they were. They were discussed at great length in the opinion. So I'm just saying, what really has changed? So I think the court actually does cite changed facts in the very next paragraph after the one I was reading from before, that Japan's interests have grown stronger because now the Japanese government has paid more than $76 billion. What's the evidence of that in the record? It was supported by declarations that we submitted in connection with our motion to dismiss from Mr. Yamazaki. Did it describe the type of claims? It described them, but in fairly high level terms as to whether they were collective actions, whether they were claims brought through the compensation system, whether they were suits. But it doesn't go through and say, therefore, this, that, and the other thing, though the declarations do explain that the compensation process permits claims and recognizes claims for bodily injury and for psychological distress caused by radiation emissions to the extent those can be proven. And so in fact, this court held and the district court held that these claims are, or the district court held and this court recognized, that the claims that plaintiffs have can go forward under the Japanese system. So I think- Can I ask you something about that? I noticed that there's a statute of limitations attached to the Compensation Act. What is it and would it preclude the plaintiffs in this action from recovery? I believe it is a 10-year statute. I think to the extent that it would preclude their action, if that was causing the court dismay, I think TEPCO would be willing to agree to, if they refiled in Japan, within a reasonable time to waive that defense. Really? Yes. Okay. But provided they filed it within some reasonable time, it wouldn't be for an indefinite into But I think our view and the view of the government of Japan is that the proper place for these claims to be resolved is Japan. The Japanese government and TEPCO have worked assiduously to compensate claimants. The goal is not to deny compensation where there is a legitimate claim. The goal is to figure out whether there is a legitimate claim, make a reasonable, fair, and consistent determination of what the compensation should be, and then provide it. That's why when Judge San Martino first ruled on the motion to dismiss, it was about $30 billion that the Japanese government and TEPCO had paid out. By the time it got to this court, it was in the $50 billion. It is, by the time it came back to Judge San Martino, it was in the $70 billion. And that was a factor that Judge San Martino recognized as increasing the Japanese government's interest here. Is the number, is the amount of the funds currently, is it sufficient to compensate the claims of the plaintiffs in this case? Yes. I think, I mean, obviously, it depends on how, what the ultimate amount of damages would be. But yes, I think there's no question that, you know, provided that the Japanese government continues backing the system, that there would be funds. And the Japanese government has made clear that, you know, to the extent there is a threat to the willingness of the people of Japan to continue its generous funding of this claims process, that threat comes from the risk of inconsistent adjudication because this claim would go forward in the United States. There's no suggestion that there would not be funds to compensate if it were going forward in Japan. Is there anything in the record to suggest what percentage of the $70 billion-plus has gone to personal injury as opposed to business losses? There's nothing in the record, Your Honor. Is there anything that describes the measure of damages that's awarded under the Compensation Act? For example, is pain and suffering included? Yes. So there are declarations, there's both Mr. Yamazaki's declaration and Professor Yamazaki's declaration of damages that are available. There's this concept of ishariyo. That would include pain and suffering. And of course, it would include any bodily injury that's the result of radiation emissions. But you'd have to prove it. But to the extent you could prove that these were injuries caused in that way, contrary to the findings of the Department of Defense, then they would be able to make out a claim. It's not that the claim is unavailable. It is available to someone who has a bona fide, provable case of radiation-related injury. By the way, something I need you to address. Mr. Edwards, or maybe both counsel for the claims, I think represented that the injuries that the claims suffered occurred on American soil. In other words, a U.S. ship. Do you agree with that? No. I think, so what I would say is that the analysis that California law actually applies to what choice of law should govern is not the place of the injury, but the place of the wrongful conduct. And that is not just in McCann and offshore. It's in a whole host of cases that are cited in our briefs that, again and again, say the relevant factor is where the conduct occurs. So, for example- Phil, are you representing TEPCO only? Yes. Okay, go ahead. And I would note on this choice of law point, I think we would argue and we continue to argue that there has been just a waiver that there was any error of choice of law as to TEPCO. That was demonstrated, as I heard Mr. Edwards argue, that these two issues have to be analyzed separately and are very different for TEPCO and GE. But if you look at plaintiff's opening brief, there is no separate analysis as to TEPCO. And in their reply brief, there's no choice of law analysis at all as to TEPCO. And so we would say it's waived, but waived or not, what the California cases say is that the relevant factor is where the conduct occurs. So, for example, McCann says, in cases in which a California resident is injured by a defendant's conduct occurring in another state, California choice of law decisions generally hold that when the law of the other state limits or denies viability, that state's interest is predominant. And that's in McCann, it's in Reich, Castro, Hernandez, Sierra, Tahoe. Again and again, it's this conduct. McCann even puts it, I think, in a more powerful way, which is only when a defendant exposes persons to the risks associated with a toxic substance through its conduct in California, could California choice of law principles allocate to California the predominant interest in regulating the conduct. Otherwise, it would be Japan or whatever foreign state's law. And again, as Judge Bivey has pointed out, my opponents have cited literally no case going the other way. There is just a sort of endless litany of California cases that say when the conduct occurs in a foreign jurisdiction, that jurisdiction's law applies, and nothing on the other side of the ledger. Just to return back to the core comity point, again, what I would say is, I understand Judge Wardlaw, your concern is that if nothing had changed, that the district court was not at liberty to revisit the decision? No, I'm not suggesting that the district court can't change her mind. So I think if that's the case... But she did say there were significant changes, and that was part of what she said that I didn't buy. So I think what she said, really, if you take out the headings and look at the analysis that follows, because I think the headings... And by the way, the clearest evidence that the headings are tracking TEPCO's arguments is that the third... She identifies three different things as significant changes in the headings. And then the third one says, this is not a change, right? So she is clearly mimicking TEPCO's arguments and then rejects the third one. But as to the first two, what she says is not the whole universe has changed. What she says is that it was always a very close case, as this court recognized, between U.S. and Japanese interests. But as she weighs them sitting there now, she thinks the Japanese interest is a little bit stronger. And what this court held in Cooper 1 is that this is a close case entrusted to the district court's discretion. And my opponent has conceded that it is only if they can show something illogical, implausible, or without support in the record in the result reached by the district court, that's as they put in their reply brief, in the result, would this court be able to reverse. But this court has already held in Cooper 1 that either way, it would have been within the district court's discretion. That wasn't just this court's holding. That's what the United States said in a statement of interest. It's what plaintiffs said in their briefing to this court. And it's what plaintiffs said in their argument to this court. Counsel, if I recall, we asked for a statement of interest from the State Department after oral argument in the last case. That's correct, Your Honor. From the Department of Justice and the State Department. Is there any reason to ask for a renewed statement of interest from the United States? No, Your Honor. I don't think so. The United States has expressed its interest here. Japan has expressed its interest. As my opponent actually argued the last time, it's undeniable that the United States is aware of this litigation. If there had been a change in the interest, the United States could have filed a brief in the district court. Neither party suggested that that was necessary or appropriate. The district court had before it the two statements of interest and waived those. And I don't see any reason why it would be necessary for this court to seek a new statement, and particularly where the other side has not requested it. One other just factual point I just wanted to note, although it doesn't follow directly, I just didn't want to leave it unanswered. There was oral argument in the district court. There was about two and a half hours of oral argument. The court did some initial argument, provided a written tentative. There was no break. The parties came back and argued extensively on these issues. So I'm sorry. I didn't mean to derail you, Judge Bybee, if you have another question. So again, what I would say is if nothing had changed, then Cooper won with counsel Undeniably, the Japanese interest has gotten at least somewhat stronger. The additional expenditure of tens of billions of dollars, the additional adjudication of tens of thousands of claims has to make that interest at least a little stronger. And the choice of law analysis clearly cuts in favor of Japanese law here. My opponent really hasn't articulated any basis as to the issues for TEPCO that is in the case. What he said is that those legal Japanese law would be easy for the district court to apply. The district court disagreed. But easy or not, that's actually not the comity analysis. The comity point is that this is a deferential doctrine in which the right of a foreign sovereign to adjudicate a case is being respected by this court. And when that foreign sovereign's law is implicated, more deference is owed to that foreign sovereign. Whether the law is easy or hard, it's still one more thing that weighs in the balance. So the only changes have been in our favor. One last question for you. Are you aware of any American personal injury claims that have been litigated through the Compensation Act in Japan? Yes, in Mr. Yamazaki's declaration. And in fact, I think in the United States Statement of Interest, they recognize that there have been successful claims brought by United States nationals. All right. Thank you, counsel. Thank you, Your Honor. Your Honor, and may it please the court, David Wiener appearing on behalf of Defendant General Electric. Under California's governmental interest test, when a plaintiff is injured by a defendant's liability for that type of conduct, that jurisdiction has the predominant interest and would be most impaired if its law is not applied. California Supreme Court and Ninth Circuit have repeatedly recognized this principle, including in cases brought by residents of California who will suffer the alleged harms of the defendant's conduct in the state. And the district court here properly recognized and applied this principle in finding that the channeling provision of Japan's Compensation Act applies to plaintiff's claims against GE and requires their dismissal. When GE supplied these reactors, what year was that? 1970? Was it before that? It's been a long time. I believe it was in the 1970s. It was the Compensation Act in place then? It was. It was enacted in the late 1970s. So GE was aware at the time that the Compensation Act, if something went wrong, that TEPCO would be responsible and not GE. That's exactly right. Is there any evidence that that was negotiated for? There's not evidence specifically... I'm sorry, evidence that what was negotiated? That GE negotiated with TEPCO or anybody else in Japan for a limitation on its liability. There is not because the limitation occurs by force of Japanese law. Right, but did they know the Japanese law was in place before they agreed to supply the reactors? Or did the Japanese law come into place after? No. So the Japanese law was enacted in, I believe it was the late 1950s or early 1960s. The supply occurred several decades, I think two decades later or a decade later. The Japanese channeling provision is effectively the same type of law that every nuclear power nation has adopted. Similar to the Price-Anderson Act. That's exactly right, Your Honor. And essentially the theory behind the Compensation Act and the channeling rule is that precisely because the operation of nuclear power plants has the potential for creating enormous liabilities and damages, there is some mechanism that needs to be in place to accomplish two goals. Number one is to encourage companies to participate in this sector. But the second is that there needs to be a mechanism that ensures compensation for individuals and businesses who are injured as a result of exposure to nuclear damage. So Japan has done that in precisely the same way that the United States did it, that other nuclear power nations have done. And that is channeling all liability to the operator, the licensed operator of the nuclear power plant. All operators in turn are required to maintain minimum levels of insurance and they participate in national insurance pools. In Japan, I think the insurance requirement was 120 billion yen. And then there's a governmental backstop where the government commits to providing compensation for individuals who are affected if damages exceed insured amounts. Japan has done that here, Your Honor. As Mr. Yohalam noted, I think the Japanese government has provided something like $85 billion in compensation to affected individuals and businesses as a result of the Fukushima disaster. And so in precisely in cases like McCann, in Arno, from this court, Castro, and offshore rental, California choice of law principles recognize that when another jurisdiction enacts a law that limits or denies liability for the purpose of encouraging industry and business, that that jurisdiction has the predominant interest and those interests would be most impaired if their laws are not applied. So it sounds like GE is trying to piggyback on to TEPCO here. I'm just wondering, what is the nature of the claim against GE? So the claims are design defect claims, manufacturing defect. Where was the product designed and manufactured? So the plaintiffs have argued now that this was all done in California. But if you actually look at the allegations in the complaint, that's not actually what they allege. But where actually were they designed and manufactured? I think it was done in a number of places. There may well have been some work here. Any designed and manufactured in Japan? In fact, part of... They were installed in Japan. They certainly were installed. And the allegations in the third amended complaint, to the extent they specifically allege where GE did anything, there are allegations of GE's conduct in Japan. And so specifically, for example, they allege GE was responsible for lowering the sea cliffs where the plant was constructed and that that was one of the defects that resulted in the meltdown. Obviously, that could not have occurred in California. By the way, at least some of the claims against GE are strict liability claims, aren't they? That's correct. They don't require finding of negligence or other fault? They have to prove a defect. Yes, but they don't have to prove negligence or other wrongdoing. They also have a negligence claim. There's a strict liability claim. And that actually contrasts sharply from the way that the Compensation Act works with respect to... Does the Compensation Act require a showing of some fault or is that... My understanding is that it's... Correct. And TEPCO has, in fact, stated this as well. And so plaintiff's claims against TEPCO, it's purely showing causation and damages. Your Honor, Judge Ward, let me get back to your question about where did this occur. And I think even if plaintiffs had alleged that there was design work that was done in California, when you evaluate whose interests would be most impaired, which is the basis for California's government interest test, the analysis still falls in favor of application of Japanese law. And the reason for that is that when you consider what's on the California side of the ledger, and there's an interest in providing compensation for California residents. California doesn't have an interest as to non-residents, but there were some plaintiffs who are California residents as to those individuals, that interest is fully respected by way of application of Japanese law, precisely because there is a claim against TEPCO that provides full compensation. So that interest is protected by application of Japanese law. And as I mentioned before, one of the purposes in enacting the Compensation Act, this is in Article I of the Act, it expressly states that one of the purposes is to provide compensation for injured individuals. The other potential interest, Your Honor, that California might have, if you were to assume that plaintiffs had alleged some design work occurred in California, would be deterring alleged negligence or the imposition of strict liability. And that interest also is respected by way of application of Japanese law. And it occurs in a slightly more indirect way, but it does occur because the premise of the Compensation Act, again, it's the same thing you have in the U.S. with Price-Anderson. It's the same thing that other nuclear power jurisdictions have is that there is still a requirement for licensing and regulatory oversight, which ensures safety. There's also the possibility for the operator to ensure that other participants in the nuclear power industry are meeting specifications, are not engaging in negligence. There could be an indemnification claim between commercial entities. So there are all sorts of ways that application of Japanese law can still fulfill those same requirements and interests that California might have. And again, if you were to hypothesize a nuclear power accident that occurs in California involving a GE generator or a GE reactor, and you had plaintiffs coming in with the same types of claims against GE, under Price-Anderson, those claims would fail. GE would not be liable from those claims by those plaintiffs. So the application of Japanese law, to get back to one of your points, Your Honor, we're not piggybacking on TEPCO. This is what Japanese law is, similar to U.S. law under Price-Anderson. It operates in very much the same way. And it's designed to foster the nuclear power industry. The Japanese government was very clear about this in its amicus brief in this court, where it made it clear the importance to maintaining this unified system for compensating individuals and ensuring that that carefully wrought structure is respected. There are no other cases other than this one that have been brought in Fukushima outside of Japan that have been permitted to go forward. There was one lawsuit that was brought by a proposed class action of Japanese businesses against GE in the District of Massachusetts that was dismissed on foreign nonconvenience grounds under the assumption that Japanese law would have to apply to those claims. Again, recognizing the important interest that Japan has in maintaining the system for controlling how liability for nuclear damage claims is handled. And Judge Bidey, with respect to the California cases, we have been citing the same groups of cases multiple times over McCann, Offshore Rental, Arno, Castro, and plaintiffs have largely ignored them and they have no way to distinguish those cases. They've, for the first time in literally five years, have suggested that those cases are distinguishable based on the notion of voluntariness. I don't think that concept actually was used in McCann. I know it was present, I think, in Offshore and possibly in Castro. But at the end of the day, even in those cases, that factor was of far less significance to the court's analysis than the importance of maintaining the integrity of the foreign jurisdiction's liability scheme. And I think it's instructive if you compare this case and you compare the interest at stake with the Compensation Act to McCann. There was no real concern that the failure to apply Oklahoma's statute of repose in that case would undo some carefully wrought system for dealing with asbestos and mesothelioma claims that would essentially undo that entire industry. Here, however, it's a very different situation. There is a concern about failure to apply channeling in this case and what impact that will have potentially opening the doors for liability and signaling to other participants in the nuclear industry that this mechanism that they have relied upon for literally decades is no longer potentially available to them. And it occurs at a time when the nuclear power industry in Japan is clearly in flux post-Fukushima and the government of Japan has, again, made that very clear signaling to U.S. courts that opening the door of liability and using a different liability scheme other than the one that they have enacted would harm Japanese interests. You know, the few cases that plaintiffs have relied upon in this court on choice of law are easily distinguished. Marsh, the Munguia case, those are cases that involve limitations on damages and whether those types of laws can apply to a non-resident defendant. And the Munguia case in particular is very instructive and that actually draws a distinction between cases that involve laws that limit liability like offshore, like McCann and Castro on the one hand, where there is an interest in applying those types of laws to non-resident defendants versus, on the other hand, laws that simply limit damages where there's not a recognized interest in applying it to a non-resident defendant. So even the case law that plaintiffs have relied upon in this court favors the application of the McCann line of cases, just as the district court did here in finding that Japanese interests would be most impaired if its laws were not applied. If there are no questions, Your Honor, I think Judge Sanmartino got it exactly right in this one. Carefully following and applying very established California Supreme Court and Ninth Circuit precedent in concluding that the Compensation Act applies. Thank you, counsel. Thank you. Mr. Edwards? Before the clock starts, because I don't have a lot of time. May I just ask the court a question, please? I guess this is addressed to Your Honor. Your Honor, is there any possibility of us being allowed a short amount of time, two or three minutes to respond specifically to the arguments that were made now that we have not talked about? That's all I would ask for, two or three minutes. All right, you can have two minutes. So let me start with simple things. I want to be sure that the court understands, and I'm confident you do already, that if this result that they're asking for occurs, then what's happening is both TEPCO and General Electric get exactly what they would get under the CSC. Exactly. With no bargain at all. And the treaty was not in place. The channel provision applies. GEA walks away. But it does so for a different reason. It doesn't do so by virtue of the CSC. That was the argument of the United States. It is under a different analysis, Your Honor. It has the same effect. Right. Just as a U.S. company might be able to rely on the CSC and its backup would be, we have the Price-Anderson Act. The problem with that, though, Your Honor, I don't want to disagree with you about this, that the issue, though, is, was the bargaining process in place? It wasn't. It wasn't. And effectively, if the court does this, I don't want to get tangled in this because I know I don't have much time. There are two or three other things I want to make sure I mention. And this is a rhetorical question. I don't expect you to answer questions. Does it not, as you have been listening to this whole discussion, Your Honor asked about whether they contested that they were on American ship on high seas. You asked questions about what the provisions were in the contract relationship between GE and TEPCO. Your Honor said multiple times that, well, what are the facts? What are the facts? Does it not bother you that there are literally no facts except the allegations of a complaint eight years later? I mean, think about for a second about what could be. I'm just abstracting. I don't know what it says. There are contractual relationships between GE and TEPCO. There could be foreign provisions. There could be liability provisions. They could have very specific issues about liability. We don't have any idea what's in it. We haven't even been allowed to ask. We don't know anything. The ship, Your Honor, the ship. We're quoting the New York Times, as Your Honor, Judge Bobby, as you pointed out, is in the New York Times because it's all we know. We haven't been allowed to ask them anything. And so we've got hundreds of sailors whose case is never going to be heard in their own courts where they are born, like you and me. They can't even get their case heard in America because we don't know what happened. And I think it is fair, by the way. Your Honor, I remember, I have to admit this. I can almost memorize the language of your opinion. Judge Bobby, I mean, I know exactly what you said. What you said was, with respect to what can happen, you did say it was fluid. You were very clear about that. And what you said was there could be factual development. None of that has occurred. You said, secondly, the countries could change their positions because of circumstances. None of that has happened. And then in fairness, you said in a footnote connected to that same paragraph that there's been no determination of choice of law. But please remember, choice of law, unlike the comedy issue, is not abuse of discretion. It is de novo. You decide what law applies, the three of you. All right. Thank you, counsel. Can I ask one question? Yeah. Mr. Weiner said something to the effect that in this country, if you were to, you know, a suit against GE were to continue in this country, GE would be protected from liability by the Price-Anderson Act. So you wouldn't get anywhere anyway. You have a response to that? Can you say it one more time? Your Honor, I had a little trouble hearing you. I'm sorry. I think he said that GE would be protected from liability by the Price-Anderson Act. That is not true. And you don't agree with that? I do not agree with that at all. No, no. GE will be responsible just like any company manufacturing a product in the United States. It is true that Price-Anderson applies to nuclear accidents in the United States. I think what he said was that GE would be protected if there were an accident in the United States. Oh, I'm sorry. I didn't hear that. Yes, yes, Your Honor. That would be true. Thank you. I believe, Bobby, honestly, you know more about Price-Anderson than I do. Well, I've told you everything I know. Thank you. Thank you. Thank you for your time, please. Thank you very much, counsel. Mr. Bonner? Yes. So there's two things that I'd like to address. First is, if we imagine this case going forward in the Southern District of California before Judge San Martino, and assuming that liability, assuming it goes forward only against TEPCO, if we make that assumption, because I'm here talking about TEPCO. If we see it going forward, it's against TEPCO. TEPCO has already admitted liability. The entire case would be causation and damages. All of the people who are necessary for causation and damages are in the United States. The costs associated with the health care that would be incurred are costs and circumstances that would have to come from witnesses and documents and testimony and experts within the United States. Not that I want you all to judge. If we go forward with TEPCO, everything for the case would be based in the United States, because liability would not be an issue. Isn't causation one of the big sticking points here? But causation is not in any way supported by anything in Japan. The plumes and the extent of the radiation are things that are going to be known through monitoring, primarily on the ships, to the extent that there are radionucleotides in the bodies of our plaintiffs would be determined from testing they do in the United States. So only as to TEPCO, there is no reason for this case, for our clients to have to go to Japan, because liability. Oh, my goodness. I think we froze here. Did we lose Mr. Bonner? Can you please reconnect? OK.  I think it was at least a minute. Yeah. And he was in the flow, too. Yeah, he was really in the moment. Well, while we're having this moment of silence, I just want to thank everybody for actually getting on planes and flying here and coming here to argue. We were announcing in general that we are going to start allowing attorneys to appear by video and making other arrangements in light of the coronavirus. But we really appreciate you all switching your plans from San Francisco to LA in light of the fact that we're based here. And coming out to argue. Great. Thank you. It's nice to hear. There's something there. There is that. Can you connect him by the phone? 330. Why don't you put Mr. Bonner on your phone and let him finish, please? I can bring the phone into the courtroom. I just need to know. OK. Dial phone or put the cell phone on the speaker? Yeah, we could dial from the cell phone and put the cell phone on the speaker. If you do that, Judge, it would sound much better  All right. Judge, by the end of the hearing, we had the plane to catch, so. Yeah. Richard, just put him. We're just going to let him finish his argument. OK. There we go. Now we've got him. Now we try to get the argument. He's on the phone. All right. So I'm not sure where you left me. Where I left you or where we left each other. I was making the point that if the case goes forward only at the TEPCO, the only issue would be causation and damages, which would, there's no reason. Yeah, so you're responding to my question because it seems to me from what I've heard of the oral argument today, the big issue is causation. And you were responding to that, why that issue could be fairly tried in California. It could be fairly tried in California because the issue with causation is what exposure did the sailors get. And the exposure that the sailors got is going to be determined by whatever instrumentation there was on the ship, whatever is found in their bodies. We've had service men and women who've had, for example, urinalysis and blood tests that have shown various residual heavy metals in their bodies, as well as sort of clinical determinations based on the constellation of symptoms and a known exposure. So those things would not require, there's nothing in Japan that would help with that, other than potentially additional documentation regarding the extent of the plume and that thing, those types of things. But those were also captured by the United States government's So with respect to the extent of the exposure, which would relate on causation, those things probably aren't even known in Japan. Those things would have to come from other sources. The last thing I would say is what I think is a point worth noting is that with respect to the cases that have come before Japan, and before the tribunals, and the extent to which there have been money paid for pain and suffering, those things are easily known to TEPCO. They could easily have distinguished those within the declarations. And the fact that they didn't speaks volumes to the fact that there probably is very little that has been paid in the way of compensation to people who've suffered personal injuries. There have been no new facts. And to your point, Your Honor, the idea that this would develop and facts would develop and those facts might change the scenario, we're not there yet. And to the extent that Judge San Martino in her decision, and when she's coming to a conclusion, she says, because this is on what I have that's on page 25, but because the Japanese government has now made its position known and defendants have made a strong showing for why Japan's foreign and public policy interests would be harmed. However, the court finds that this factor now weighs slightly in favor of dismissal. And it's this unbalanced argument by the district court acknowledging only the Japanese government's position that is the abuse of discretion, and that there's no logical reason why that sentence wouldn't also include. However, we acknowledge that the United States government has a different position, and let's look at how that balances out. All right. Thank you, counsel. Thank you. Hoover v. Tokyo Electric Power Company will be submitted, and this session of the court is adjourned for today. Thank you. Thank you. Thank you. The court for this session stands adjourned.
judges: Tashima, Wardlaw, Bybee